# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| DEIRDRE DUFFY,<br><br>    *Plaintiff*,<br><br> v.<br><br>EUGENE LOUIS DODARO, Comptroller General of the United States,[1]<br><br>    *Defendant*. | Civil Action No. 16-1178 (RDM) |

## MEMORANDUM OPINION AND ORDER

Deirdre Duffy is a disabled veteran who was employed as a Band IIA Communications Analyst at the Government Accountability Office ("GAO") from July 2013 until December 2016. Dkt. 31 at 2–3. Proceeding *pro se*, Duffy asserts fifteen claims against her former employer, including claims under several federal employment discrimination statutes, the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671–2680, the due process clause of the Fifth Amendment, and a claim for breach of contract. Dkt. 31 at 87–102. The GAO, in turn, moves to dismiss all of her claims or, in the alternative, for summary judgment with respect to her Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12111 *et seq*., claim for failure to accommodate. Dkt. 33 at 1; Dkt. 33-1 at 13.

For the reasons explained below, the Court will **GRANT** in part and will **DENY** in part the GAO's motion.

---

[1] Comptroller General Dodaro is automatically substituted Reginald E. Jones as the Defendant pursuant to Fed. R. Civ. Pro. 25(d).

## I.  BACKGROUND

### A.  Factual Background

The following facts are taken from Duffy's second amended complaint, Dkt. 31, which the Court must accept as true for purposes of the GAO's motion to dismiss, *see Klayman v. Zuckerberg*, 753 F.3d 1354, 1357 (D.C. Cir. 2014).  Duffy suffers from chronic Post Traumatic Stress Disorder ("PTSD") related to her military service.  Dkt. 31 at 3 (Second Am. Compl. ¶¶ 1–2).  Her PTSD symptoms include "hyperarousal," which causes her nervous system to "operate on full alert" and "impair[s] her ability to sleep, learn, and remember."  *Id.* at 3–4 (Second Am. Compl. ¶¶ 3–4).  Unless properly managed, this can cause her physical harm, such as "damage [to her] endocrine system, reduce[d] immunity, [and] . . . autoimmune issues."  *Id.* at 4 (Second Am. Compl. ¶ 4).  To minimize the physical and psychological effects of her PTSD, Duffy "must meticulously manage all facets of her immediate environment . . . as well as her diet, exercise, social activities, sleep hygiene, and thought processes."  *Id.* at 5 (Second Am. Compl. ¶ 6).

Duffy applied for a position as a Band I Communications Analyst at the GAO in September 2009.  Dkt. 31 at 35 (Second Am. Compl. ¶ 71).  In order to receive a veteran's preference in the GAO's consideration of her application, Duffy submitted her discharge paperwork from U.S. military, which states that she has a "Disability – Permanent."  *Id.*  She was notified that she was among the "most qualified" for the position and that "an interview would be scheduled."  *Id.* (Second Am. Compl. ¶ 72).  "No interview was scheduled," and Duffy "never received any written notice of a hiring decision" with respect to that position.  *Id.*

In February 2013, Duffy once again applied for position at the GAO, this time for a job as a Band II Communications Analyst.  *Id.*  (Second Am. Compl. ¶ 74).  As with her first

application, Duffy submitted her military discharge paperwork to the GAO, which again reflected her permanent disability. *Id.*; *see also* Dkt. 38-1 at 2–4, 57–60. Duffy was invited to interview for a position working with the GAO's Strategic Issues ("SI") mission team, and, during the interview process, she was told that the position "would be located in . . . the San Francisco, Boston, or Atlanta field offices based upon [the] selectee['s] preference." Dkt. 31 at 35 (Second. Am. Compl. ¶ 75). She "was also invited to interview for a Band II Communications Analyst position within [the] GAO's Strategic Planning and External Liaison ('SPEL') office" and was told "by the Hiring Manager for this position that it was located [at the] GAO['s] Headquarters in Washington[,] D.C." *Id.* at 36 (Second. Am. Compl. ¶ 76).

In May 2013, the GAO offered Duffy a position working with either the SI mission team or the SPEL office. *Id.* at 37 (Second. Am. Compl. ¶ 79). After she called to accept the position with the SI mission team and elected to work in San Francisco in order to be closer to her home in Seattle, the GAO informed Duffy that, despite what she had had previously been told, the SI position was available only in Washington, D.C. *Id.* (Second. Am. Compl. ¶¶ 81–82). Duffy then asked if the SPEL position was still available and was told that the position had been filled. *Id.* (Second. Am. Compl. ¶ 83). As a result, Duffy accepted the position with the SI mission team in Washington, D.C. *Id.* (Second. Am. Compl. ¶ 84). She began work at the GAO as a Band IIA Communications Analyst on July 1, 2013. *Id.* at 38 (Second. Am. Comp. ¶¶ 85–86).

In September 2013, several months after starting work, Duffy "met with a member of the" GAO's human resources office "to discuss concerns that she had [about] sirens that went off continuously outside the office" and "the intensity of the work culture in the [D.C.] GAO office" and how these "conditions" might negatively affect "her PTSD." *Id.* at 44 (Second. Am. Compl. ¶ 115). The human resources office referred her to a website and to other information regarding

reasonable accommodations and, about a month later, Duffy requested "episodic telework arrangements so she could travel back and forth to her home" in the Seattle area in order "to manage her PTSD symptoms and obtain respite from the urban stressors." *Id.* (Second Am. Compl. ¶ 117). Duffy made this request to her supervisor, Brian James, and it was approved by the SI mission team's Managing Director, Chris Mihm. *Id.* at 35, 44 (Second Am. Compl. ¶¶ 75, 118).

This "episodic telework arrangement[]" continued until at least October 2014, and, during that time, Duffy "made key contributions" to the SI mission team's work, including training other staff members, *id.* at 44, 47 (Second Am. Compl. ¶¶ 117, 128–29), helping the "Assistant Director during a staffing shortfall," *id.* at 47 (Second Am. Compl. ¶ 129), and aiding in the production of at least three different GAO reports that received "significant media attention," *id.* In recognition of her work, Duffy received time off awards, praise from her team and supervisors, as well as additional work due to increased demand for her skills. *Id.* (Second Am. Compl. ¶¶ 129–30).

In October 2014, Duffy developed a "severe dental abscess" while visiting Seattle, "which required an emergency root canal" and a month-long recovery there. *Id.* at 53 (Second Am. Compl. ¶ 151). James approved Duffy's request to telework from Seattle during this period. *Id.* Upon returning to Washington, D.C. at the end of that month, however, Duffy began to experience "a systemic breakdown of her health as a result of stimuli overload and/or chronic hyperarousal of her nervous system." *Id.* at 53 (Second Am. Compl. ¶¶ 151–52). As a result, in November 2014, she "submitted a formal Reasonable Accommodation request to GAO's Reasonable Accommodations Coordinator, Colleen Marks . . . , seeking to work full time from her home in the Seattle area" or, in the alternative, "reassignment to the San Francisco field

office or to a mission team with a presence in the Seattle office." *Id.* at 54 (Second Am. Compl. ¶ 155). After Duffy notified James of her "formal accommodation [r]equest," he told her "don't do that" and said that she "should instead request accommodation [through] the short term telework program" so her supervisors could "approve [it] internally." *Id.* (Second Am. Compl. ¶ 156). Based on that advice, Duffy withdrew her formal accommodation request. *Id.* (Second Am. Compl. ¶ 157). Duffy then requested a six-month short-term telework arrangement, which was approved. *Id.* at 54–55 (Second Am. Compl. ¶ 158). Duffy began working full-time from home near Seattle on December 1, 2014. *Id.* at 55 (Second Am. Compl. ¶ 159).

Between March 2015 and May 2015, Duffy "developed serious complications related to an improperly treated dental condition" that prevented her from returning to Washington, D.C. by May 30, 2015, when her six-month telework arrangement was scheduled to conclude. *Id.* at 59–60 (Second Am. Compl. ¶¶ 167, 174). At James's suggestion, Duffy requested and was granted a second short-term telework arrangement allowing her to continue to work from the Seattle area from June 2015 through November 2015. *Id.* at 60 (Second Am. Compl. ¶¶ 170–71). After Duffy expressed concerns to James about her ability to return to Washington, D.C. in December 2015, James recommended she "apply for a formal reasonable accommodation [through] Colleen Marks's [disability program] office." *Id.* at 60–61 (Second Am. Compl. ¶¶ 173–74). When Duffy asked Marks for "information about what she needed to submit with her formal Reasonable Accommodations . . . request," "Marks stated that [Duffy] needed to have her doctor provide the answers to a 'six-point questionnaire'" but "did not mention or provide any internal guidance on additional criteria related to granting [the] request." *Id.* at 61 (Second Am. Compl. ¶ 175). Duffy submitted her formal request in early October 2015, which included the completed six-point questionnaire along with additional medical documentation from two other

doctors and a medical release permitting GAO staff to speak directly with Duffy's treating clinician. *Id.* at 64 (Second Am. Compl. ¶ 187).

On October 22, 2015, Duffy met with Marks and Lisa Briscoe, a Reasonable Accommodations Specialist, to discuss her formal accommodation request. *Id.* at 63, 65 (Second Am. Compl. ¶¶ 184, 190). Duffy alleges that, at this meeting, Marks "verbally denied" her request and "insisted" that Duffy had "not established (1) the presence of a disability under the ADA or (2) that functional limitations of that disability exist." *Id.* at 65 (Second Am. Compl. ¶ 190). When Duffy sought additional information, including the written policies supporting the denial of her request, Marks refused to furnish it and stated that, if Plaintiff disagreed with the decision, Marks "could convene the Accommodation Committee." *Id.* at 66 (Second Am. Compl. ¶ 190). Marks cautioned Duffy, however, that if she convened the Accommodation Committee, "[t]he Comptroller of the United States—and several members of the Executive Committee—are going to learn all about your 'mental disorder'" and asked, "Would you like me to do that?" *Id.* Duffy responded "that under no circumstances would she permit Marks to 'out' her to the" Accommodations Committee "until Marks provided written proof that the denial was legitimate policy," and Duffy again "requested to see the written policy and the criteria list for the kinds of doctors, letters, etc. that [the] GAO required." *Id.* According to Duffy, "Marks repeatedly ignored her request for policy documentation." *Id.*

Duffy alleges that Marks did inform her that the medical documentation she submitted in support of the request was "invalid," *id.* at 65, 67 (Second Am. Compl. ¶ 190), and that "she needed a full medical evaluation and a report of all [of Duffy's] symptoms so Marks could 'see just how disabled you *really* are,'" *id.* at 67 (Second Am. Compl. ¶ 190) (emphasis in original). According to the second amended complaint, Marks told Duffy that the letter she had submitted

from her physician "was invalid because Marks 'didn't know who this person is'" and that she "asked [Duffy] if she would be willing to submit to a medical examination by a clinician chosen by Marks." *Id.* at 67–68 (Second Am. Compl. ¶ 190). Duffy refused and asserted that she had already been found to have a permanent disability by the Veterans Administration ("VA") and had already established an "existing disability." *Id.* at 68 (Second Am. Compl. ¶ 190). Briscoe then stated that "PTSD . . . changes over time[] and [that Duffy] might not even have it anymore." *Id.* at 68 (Second Am. Compl. ¶ 190). Duffy further claims that Marks stated, "[j]ust because the VA says you have a permanent disability doesn't mean you do. The fact that you work full-time for [the] GAO proves that you are not 100% disabled." *Id.* (emphasis omitted).

Duffy accused Briscoe and Marks of "harassment" and indicated that she "intended to report them for it." *Id.* at 69 (Second Am. Compl. ¶ 191). After the meeting, Duffy informed Marks "in writing that all further determinations on her Reasonable Accommodations request would require [Equal Employment Opportunity ('EEO')] involvement and assurances that the process was fair." *Id.* (Second Am. Compl. ¶ 194). The day after the meeting, Duffy contacted the GAO's Office of Opportunity and Inclusiveness ("O&I"), to initiate the EEO counseling process. *Id.* at 70 (Second Am. Compl. ¶ 196).

In mid-November 2015, Duffy submitted a request for accommodation that would permit her to telework just from December 1, 2015 until the end of January 2016. *Id.* at 72 (Second Am. Compl. ¶ 204). Marks sought additional information from one of Duffy's doctors before she would consider the request, notwithstanding the fact that Marks already had a letter from that doctor and the doctor was out of the country. *Id.* (Second Am. Compl. ¶ 205). Duffy's request "was not granted." *Id.* (Second Am. Compl. ¶ 206). Around the same time, Duffy underwent surgery to remove an infected bone from her upper jaw. *Id.* at 73 (Second Am. Compl. ¶ 209).

She "requested and was approved for sick leave to recover." *Id.* At the end of November 2015,

Duffy's short-term telework arrangement expired, and she thus requested unpaid Family and

Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, leave "to avoid being marked AWOL

from her position." *Id.* at 73–74 (Second Am. Compl. ¶¶ 210–11). Her FMLA request was

approved through March 2016. *Id.* at 74 (Second Am. Compl. ¶ 213).

Meanwhile, the EEO process was ongoing. On February 4, 2016, Duffy filed a formal

EEO complaint with O&I, "requesting . . . that the hostile workplace cease and that her

reasonable accommodation of ongoing telework be reinstated/continued." *Id.* at 76 (Second Am.

Compl. ¶ 223). Duffy "was never contacted by anyone from O&I regarding her formal EEO

complaint," and the complaint was dismissed on March 21, 2016. *Id.* (Second Am. Compl.

¶¶ 224, 226)

Upon the expiration of her FMLA leave, Duffy requested further FMLA leave through

July 31, 2016, and that request was granted. *Id.* at 77 (Second Am. Compl. ¶ 229). On May 25,

2016, Duffy "again requested that Marks grant her [a] reasonable accommodation," and she

submitted "the medical documentation submitted previously," "an analysis of her prior

submissions" explaining why she "had met and exceeded [the] GAO's requirements," and "a

letter dated April 19, 2016, from her treating" physician. Dkt. 31 at 78 (Second Am. Compl.

¶¶ 233–234). Marks again "denied [Duffy's] request for [a] reasonable accommodation,"

concluding that the medical documentation Duffy submitted was insufficient to support the

accommodation she requested because it failed to "provide information concerning the nature

and severity of the medical conditions and current functional limitations imposed by those

conditions." *Id.* at 78–79 (Second Am. Compl. ¶ 236). Duffy requested information from Marks

about the possibility of personally appearing before the Accommodations Committee but did not receive any response. *Id.* at 79 (Second Am. Compl. ¶¶ 238–39).

On June 3, 2016, Duffy "applied for a no-cost transfer" to the GAO's Seattle field office but alleges that this request was never addressed. *Id.* at 80 (Second Am. Compl. ¶¶ 243–44). Duffy also made "a transfer request via the Employee Preference Survey." *Id.* at 81 (Second Am. Compl. ¶ 247). The GAO did not grant either request. *Id.* at 80 (Second Am. Compl. ¶ 244) (no-cost transfer request); *id.* at 82 (Second Am. Compl. ¶ 251) (Employee Preference Survey request). On July 31, 2016, Duffy requested leave without pay through October 31, 2016, which the GAO granted. *Id.* at 81 (Second Am. Compl. ¶ 248). In September 2016, she asked for an extension of that leave beyond October 31, 2016, and the GAO approved that request as well but informed Duffy that her unpaid leave could not be extended "indefinitely." *Id.* at 82–83 (Second Am. Compl. ¶ 255). On December 1, 2016, Duffy formally resigned from her position. *Id.* at 83 (Second Am. Compl. ¶ 259).

## B. Procedural Background

Duffy filed this action on June 20, 2016, while still an employee of the GAO. *See* Dkt. 1. Her initial complaint, which was prepared by counsel, included a single claim: that the GAO violated the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 701 *et seq.*, when it denied Duffy's reasonable accommodation requests. *Id.* at 8–9. Duffy's counsel subsequently withdrew, Dkt. 17; Minute Order (Nov. 30, 2016), and Duffy, proceeding *pro se*, filed her first amended complaint, which still advanced a single claim under the Rehabilitation Act, *see* Dkt. 19 at 20. With leave of Court, Duffy later filed her second amended complaint, which asserts fifteen claims, including claims under the Rehabilitation Act, the ADA, and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-16, and claims for breach of contract,

defamation, intentional infliction of emotional distress, and civil conspiracy. Dkt. 31 at 87–104. Duffy also alleges that the GAO constructively discharged her without due process, in violation of the Fifth Amendment. *Id.* at 102. The GAO now moves to dismiss all of Duffy's claims for lack of subject-matter jurisdiction and for failure to state a claim upon which relief may be granted, and moves, in the alternative, for summary judgment with respect to Duffy's failure-to-accommodate claims on the ground that she affirmatively abandoned her request for an accommodation. Dkt. 33 at 1; Dkt. 33-1 at 13.

## II. LEGAL STANDARD

The GAO moves to dismiss under both Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6) and moves, in the alternative, for partial summary judgment under Federal Rule of Civil Procedure 56.

A motion to dismiss under Rule 12(b)(1) challenges the Court's jurisdiction to hear a claim and may raise a "facial" or a "factual" challenge to the Court's jurisdiction. A facial challenge asks whether the plaintiff has alleged facts sufficient to establish the Court's jurisdiction, while a factual challenge asks whether "the complaint [as] supplemented by undisputed facts evidenced in the record, or the complaint [as] supplemented by undisputed facts plus the [C]ourt's resolution of disputed facts," *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992), establish that the Court has jurisdiction. The plaintiff bears the burden of establishing that the Court has subject matter jurisdiction. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Courts must construe *pro se* pleadings "liberally" and must hold *pro se* pleadings "to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).

A motion to dismiss for failure to statute a claim under Rule 12(b)(6), in contrast, tests the legal sufficiency of the allegations contained in the complaint. A complaint must contain "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957). Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion to dismiss, a plaintiff must furnish "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Id.* Instead, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (citations omitted).

Finally, a court's adjudication of a motion for summary judgment under Rule 56 asks whether the moving party is legally entitled to prevail based on the undisputed facts. The Court will grant summary judgment if the movant shows "that there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A fact is "material" if it is capable of affecting the outcome of the litigation. *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). A dispute is "'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson*, 477 U.S. at 248) "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A).

### III. ANALYSIS

Duffy's second amended complaint asserts fifteen different claims, including claims under the ADA, the Rehabilitation Act, and Title VII and claims for breach of contract,

defamation, intentional infliction of emotional distress, civil conspiracy, and a violation of her right to due process. Dkt. 31 at 87–104. Several of the GAO's challenges to Duffy's claims are easily resolved and thus the Court begins with those.

## A.    Title VII of Civil Rights Act

The GAO argues that Duffy's Title VII claims (Counts VII, IX, and X) must be dismissed because the second amended complaint does not contain any allegations of discrimination on the basis of any of the characteristics protected by that statute.  Dkt. 33-1 at 14–15.  Title VII prohibits discrimination on the grounds of "race, color, religion, sex, or national origin," 42 U.S.C. § 2000e-2(a), but not disability, *see Sledge v. District of Columbia*, 63 F. Supp. 3d 1, 19 (D.D.C. 2014).  Because the second amended complaint says nothing about discrimination based on Duffy's race, color, religion, sex, or national origin, the Court must dismiss Duffy's Title VII claims for failure to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6).

## B.    Breach of Contract Claim

The GAO also moves to dismiss Duffy's breach of contract claim (Count XIV) arguing that the Court lacks jurisdiction over it.  Dkt. 33-1 at 15–16.  The Court agrees.  "In suits against the government, subject-matter jurisdiction turns on at least 'two different jurisdictional questions.'"  *Yee v. Jewell*, 228 F. Supp.3d 48, 58 (D.D.C. 2017) (quoting *Trudeau v. FTC*, 456 F.3d 178, 183 (D.C. Cir. 2006)).  "First, has Congress provided an affirmative grant of subject-matter jurisdiction?  And, second, has Congress waived the United States's immunity to suit?" *Id.*

The Tucker Act, 28 U.S.C. § 1346 *et seq.*, provides the exclusive waiver of sovereign immunity for cases against the United States based on contracts.  *Spectrum Leasing Corp. v.*

*United States*, 764 F.2d 891, 895 & n.8 (D.C. Cir. 1985).  Although district courts have concurrent jurisdiction over Tucker Act claims for "damages" of no more than $10,000, the United States Court of Federal Claims has exclusive jurisdiction under the Tucker Act of claims for "damages" in excess of $10,000.  *See* 28 U.S.C. § 1346(a)(2).  Because Duffy seeks damages in excess of $10,000, *see* Dkt. 31 at 103 (seeking "full backpay and front pay" as well as "l[o]st wage increases, promotions, and fringe benefits" and "losses to pension, social security, and other retirement accounts," among other forms of monetary relief), the Court lacks jurisdiction over her claim for breach of contract.

## C.      Tort Claims

The GAO further moves to dismiss Duffy's D.C. law tort claims (Counts XI, XII, XIII) for lack of subject-matter jurisdiction.  Dkt. 33-1 at 17.  Although the second amended complaint lists several defendants including Marks and Briscoe, among others, Dkt 31 at 3, Duffy has served only the GAO, Dkt. 8 at 2 (summons accepted by employee authorized to receive service on behalf of the agency); *see also* Fed. R. Civ. P. 4, and counsel has appeared only on behalf of Reginald Jones, *see* Dkt. 9, who served as the Managing Director of the GAO's Office of Opportunity & Inclusiveness at the relevant time, and the GAO itself, Dkt. 33.  The United States—and "public officials sued in their official capacities," *Wilson v. Dep't of Transp.*, 759 F. Supp. 2d 55, 64 (D.D.C. 2011), are subject to suit for damages only if Congress has waived the sovereign immunity of the United States.  The Federal Tort Claims Act provides a "limited waiver of sovereign immunity" and governs what tort claims can be brought against the United States.  *Wilson*, 759 F. Supp. 2d at 64; *Sloan v. Dep't of Housing and Urban Dev.*, 236 F.3d 756, 759 (D.C. Cir. 2001).  Given this background, the Court now addresses each of Plaintiff's common law tort claims in turn.

Duffy's claim for defamation must be dismissed because claims for "libel" and "slander" are specifically excluded from the FTCA's waiver of sovereign immunity. 28 U.S.C. § 2680(h). Courts have interpreted this exclusion to generally bar defamation claims. *See Gardner v. United States*, 213 F.3d 735, 737 n.1 (D.C. Cir. 2000) ("[Plaintiff's] defamation claim against the United States is barred, because suits for libel or slander are prohibited under the Federal Tort Claims Act."). Because "the FTCA does not waive immunity for claims of defamation," *Wilson*, 759 F. Supp. 2d at 64, Duffy's defamation claim must be dismissed for lack of subject-matter jurisdiction.

As Defendant points out, Dkt. 33-1 at 18, Duffy's claims for intentional infliction of emotional distress and civil conspiracy lie beyond the Court's jurisdiction for a different reason: Duffy failed to exhaust her administrative remedies with respect to those claims, as required by the FTCA. An FTCA claimant may not bring suit until she has first presented her claim to the agency, and the agency has finally denied it. *See* 28 U.S.C. § 2675(a). To satisfy this requirement, "a claimant [must] file (1) a written statement sufficiently describing the injury to enable the agency to begin its own investigation, and (2) a sum-certain damages claim." *GAF Corp. v. United States*, 818 F.2d 901, 920 (D.C. Cir. 1987).

According to the unrebutted declaration of Joan M. Hollenbach, the Managing Associate General Counsel of the GAO and the head of the GAO's Legal Services group, Duffy has not filed any administrative FTCA claims with the GAO. *See* Dkt. 33-11 at 2. (Hollenbach Decl. ¶ 2); *see also Herbert*, 974 F.2d at 197 (permitting courts to consider outside evidence in evaluating a motion to dismiss under Rule 12(b)(1)). Duffy did file an EEO complaint with GAO, *see* Dkt. 33-7, but that complaint does not assert a tort claim and does not include a sum-certain claim of damages, *id*. Because Duffy failed to make a "presentment" as required by

§ 2675(a), the Court lacks jurisdiction to consider Duffy's remaining tort claims. *See GAF Corp.*, 818 F.2d at 918 ("Presentment is mandatory" under the FTCA "to determine . . . jurisdiction").

The Court will, accordingly, dismiss all of Duffy's common law tort claims for lack of jurisdiction. *See* Fed. R. Civ. P. 12(b)(1).

## D.    Constitutional Claim

The GAO moves to dismiss Duffy's Fifth Amendment due process claim (Count XV) on the ground that the ADA "is the exclusive remedy" for claims alleging disability discrimination or failure to accommodate a disability. Dkt. 33-1 at 19–20. Federal employees may not recast Title VII claims as constitutional claims for employment discrimination. *Ethnic Emps. of Library of Congress v. Boorstin*, 751 F.2d 1405, 1414–15 (D.C. Cir. 1985) (applying *Brown v. GSA*, 425 U.S. 820, 832–33 (1976)). At the same time, however, the existence of a statutory cause of action does not typically preclude claims that are not cognizable under the statute. In *Ethnic Employees of Library of Congress*, for example, the D.C. Circuit dismissed constitutional claims that merely restated claims that were cognizable under Title VII, but it allowed other constitutional claims–including a due process claim—to proceed because Title VII did not provide a remedy for those claims. *Id.* at 1415 ("Nothing in [Title VII's] history even remotely suggests that Congress intended to prevent federal employees from suing their employers for constitutional violations against which Title VII provides no protection at all.").

As drafted, Duffy's second amended complaint does not clearly state a cognizable due process claim. It is possible that Duffy could assert a due process claim that does not merely replicate her ADA claims. But the problem is that she merely alleges that the GAO "deliberately and without due process deprive[d] [her] of her property interest in her position as a

Communications Analyst Band II" and that it "did so with the intention to so harm [her] that should would have no resources with which to pursue a fair and just resolution of her complaint." Dkt. 31 at 102 (Second Am. Compl.). Because the Court cannot discern from these bare allegations whether Duffy intends to allege a claim that differs from her ADA claims and, if so, in what way the claims differ, the Court will dismiss Count XV pursuant to Federal Rule of Civil Procedure 8. Rule 8 requires a plaintiff to plead facts sufficient to "give the defendant fair notice of what that . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (quoting *Conley*, 355 U.S. at 47). As drafted, Count XV fails to provide the GAO or the Court with sufficient notice of the grounds upon which the claim rests; the GAO cannot meaningfully respond to it and the Court cannot determine whether it states a claim.

The Court will, accordingly, dismiss Count XV without prejudice.

**E.  Americans with Disabilities Act**

Duffy asserts seven claims under the ADA, *see* Dkt. 31 at 87–95, which applies to the GAO by virtue of 42 U.S.C. § 12209(1). Specifically, she brings ADA claims for disability discrimination (Count I), hostile work environment (Count II), denial of a reasonable accommodation (Count III), disability discrimination on the basis of mental illness (Count IV), disability harassment (Count V), disparate treatment (Count VI), and retaliation (Count VII). *See* Dkt. 31 at 87–95. The GAO moves to dismiss each of these claims on the basis that Duffy did not exhaust her administrative remedies and also moves to dismiss Duffy's hostile work environment claim for failure to state a claim. Dkt. 33-1 at 20–23. In the alternative, the GAO seeks partial summary judgment on Duffy's reasonable-accommodation claim. *Id.* at 23–26.

1. *Exhaustion*

"Before bringing suit in federal court, ADA plaintiffs, like those under Title VII, must exhaust their administrative remedies."[2] *Marshall v. Fed. Express Corp.*, 130 F.3d 1095, 1098 (D.C. Cir. 1997) (citing 42 U.S.C. § 12117(a); *Park v. Howard Univ.*, 71 F.3d 904, 907–09 (D.C. Cir. 1995)). But because the GAO is an agency of the legislative branch of the U.S. government, *see Bowsher v. Synar*, 478 U.S. 714, 731–32 (1986), the usual procedures for exhausting administrative remedies for ADA claims against private employers do not apply, *see* 42 U.S.C. § 12111(5)(B) ("The term 'employer' does not include . . . the United States."). Congress, instead, provided that employees of the GAO may invoke the enforcement mechanisms typically available for ADA cases, "except that the authorities of the Equal Employment Opportunity Commission shall be exercised by the chief official of the" GAO. 42 U.S.C. § 12209(5); *see*

---

[2] Lack of exhaustion under the ADA is an affirmative defense, which the defendant has the burden of proving. *Adams v. District of Columbia*, 740 F. Supp. 2d 173, 185 (D.D.C. 2010) (citing *Brown v. Marsh*, 777 F.2d 8, 13 (D.C. Cir. 1985)). Ordinarily, a party seeking to assert an affirmative defense must wait to do so until a motion for summary judgment; plaintiffs are not required to anticipate affirmative defenses and to plead facts sufficient to avoid those defenses, and thus a defendant cannot move to dismiss under Rule 12(b)(6) on the mere ground that the complaint fails to allege facts that, if taken as true, would overcome the affirmative defense. *See* Wright & Miller, Federal Practice and Procedure § 1277; *see also Jones v. Bock*, 549 U.S. 199, 216 (2007) (clarifying that where exhaustion is non-jurisdictional, plaintiffs "are not required to specially plead or demonstrate exhaustion in their complaints"). But if the complaint itself alleges facts that establish the affirmative defense, the defendant may rely on those factual allegations to support a motion to dismiss under Rule 12(b)(6). *See Calderon v. Berryhill*, No. 17-cv-494, 2019 WL 4575605, at *4 (D.D.C. Sept. 20, 2019). The defendant prevails, however, only if the validity of the affirmative defense is evident on the face of the complaint. *See Smith–Haynie v. District of Columbia,* 155 F.3d 575, 578–79 (D.C. Cir. 1998). Here, because the GAO moves in the alternative for summary judgment, the Court may consider the administrative materials attached to its motion. But, because the GAO does not include assertions of fact relating to exhaustion in its statement of undisputed material facts, Dkt. 33-2, the Court limits its analysis to the allegations contained in the second amended complaint.

*also* 31 U.S.C. § 732(a).   Under GAO regulations, a "charge alleging prohibited discrimination" in violation of the ADA is subject to "GAO Order 2713.2."  4 C.F.R. § 28.98(a).  Under that Order, in turn, "[a]n aggrieved person must contact an O&I counselor within 45 days of the date of the matter alleged to be discriminatory."  Dkt. 33-6 at 9.  Subject to certain exceptions, the O&I counselor then has 30 days to conduct a final interview with the aggrieved person, and, "[i]f the matter has not been resolved to the satisfaction of the aggrieved person, that person [must] be informed . . . of the right to file [an administrative] discrimination complaint" within fifteen "days of receipt of the notice."  *Id.* at 10–11.  "[T]he procedural requirements of . . . the ADA . . . must be assessed on a claim-by-claim basis and . . . satisfaction of the procedural requirements for a 'relate[d]' act of discrimination is insufficient, except in those cases in which the 'very nature' of the claim 'involves repeated conduct.'"  *Hargrove v. AARP*, 205 F. Supp. 3d 96, 119 (D.D.C. 2016) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114–15 (2002)).

Here, Duffy alleges that she first sought EEO counseling on October 23, 2015, Dkt. 31 at 70 (Second Am. Compl. ¶ 196), and that she filed her formal EEO complaint through O&I on February 4, 2016, asserting a hostile work environment claim and a failure to accommodate claim, *id.* at 76 (Second Am. Compl. ¶ 223).  As explained below, these steps were sufficient to preserve Duffy's hostile work environment claim and at least a portion of her failure to accommodate claim.  They were not sufficient, however, to preserve her ADA retaliation claim.

Counts II and V of the second amended complaint both allege that Duffy was subjected to a hostile work environment because of her disability.  Dkt. 31 at 88–89, 91–92.  As the Supreme Court has explained, the "very nature" of a hostile work environment claim "involves repeated conduct."  *Morgan*, 536 U.S. at 115.  As a result, as long as one "act contributing to the

claim" took place within the statutory period—here, within 45 days of Duffy seeking EEO counseling—"the entire period of the hostile environment may be considered for the purposes of determining liability." *Id.* at 117. And, here, Duffy's O&I complaint contains allegations that Marks made derogatory comments about her disability during a meeting on October 22, 2015— the day before she first contacted the O&I counselor. *See* Dkt. 31 at 65–70 (2d Am. Compl. ¶ 190–96). Accordingly, the Court rejects the GAO's argument that "Plaintiff has . . . failed to exhaust her administrative remedies for any action that occurred prior to September 8, 2015, which was 45 days before Plaintiff initiated her EEO claim." Dkt. 33-1 at 21. Under settled law, the Court must consider events that occurred outside the 45-day window for initiating the O&I counseling process, so long as those events are "part of the same actionable hostile work environment" as Marks's conduct in the October 22, 2015 meeting. *Morgan*, 536 U.S. at 120. Because the GAO has made no argument about which allegations or actions predating September 8, 2015 it seeks to preclude the Court from considering, the Court will deny the GAO's motion to dismiss any portion of Duffy's hostile work environment claims for failure to exhaust administrative remedies.

Plaintiff's denial of reasonable accommodation (Count III) and disparate treatment (Count VI) claims, Dkt. 31 at 89–90, 92–94, in contrast, are not the type of claims that by their "very nature" "involve[] repeated conduct." *Morgan*, 536 U.S. at 115; *see Owens-Hart v. Howard Univ.*, 220 F. Supp. 3d 81, 93 (D.D.C. 2016) (explaining that each denial of an accommodation is a separate "discrete act"); *Panarello v. Zinke*, 254 F. Supp. 3d 85, 102–03 (D.D.C. 2017) (describing incidents of disparate treatment as discrete acts). The GAO argues that at least some conduct that might be relevant to those claims occurred either before September 8, 2015 or after Duffy submitted her O&I complaint in February 2016. *See* Dkt. 33-1

at 20–23.  Accordingly, if Duffy's claims depended on that conduct, the Court would be required to dismiss those claims for failure to exhaust.  But Duffy's claims do not depend on conduct occurring outside the exhaustion window.  She alleges, for example, that she submitted requests for accommodation in both October and November 2015 and that both requests were denied. Dkt. 31 at 64–65 (Second Am. Compl. ¶¶ 187, 190) (October 2015 request); *id.* at 72 (Second Am. Compl. ¶¶ 204–06) (November 2015 request).  She also alleges that, during that period, non-disabled employees were permitted to work from an alternate location eight out of every ten workdays but that she was not.  *Id.* at 94 (Second Am. Compl.)  And, she alleges that she complained of those denials in her EEO counseling and formal complaint.  *Id.* at 70, 76 (Second Am. Compl. ¶¶ 196, 223).  The Court, accordingly, cannot dismiss Duffy's failure to accommodate or disparate treatment claims because she has alleged at least one theory supporting relief for each claim that is premised on conduct that she timely raised in the administrative EEO process.

The Court agrees with the GAO, however, that Duffy failed to exhaust her administrative remedies with respect to her retaliation claim (Count VII).  *Id.* at 94 (Second Am. Compl.).  Even as described by Duffy herself in the second amended complaint, Duffy's O&I complaint did not include allegations of unlawful retaliation.  Nor can the Court conclude that Duffy's administrative allegations of harassment and failure to accommodate were sufficient to encompass her claim for retaliation.  As this Court has previously explained in *Hargrove v. AARP*, 205 F. Supp. 3d 96 (D.D.C. 2016), prior to the Supreme Court's decision in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), the D.C. Circuit "permitted a Title VII plaintiff—and by implication, and an ADA plaintiff to bring a lawsuit asserting claims that were administratively exhausted or that were 'like or reasonably related to the allegations'

contained in the administrative complaint or 'growing out of such allegations.'" *Hargrove*, 205

F. Supp. 3d at 118 (quoting *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995)) (other

internal citations omitted). *Morgan*, however, put an end to the "reasonably related" rule, and an

ADA plaintiff must now timely exhaust administrative remedies with respect to claims—unlike

hostile workplace claims—premised on "discrete acts of discrimination." *Id.* at 119 (citing

*Morgan*, 536 U.S. at 113). Here, because Duffy's O&I complaint was limited to hostile

workplace and failure to accommodate claims, she cannot now assert a separate—and

unexhausted—claim for retaliation.[3]

The Court will, accordingly, dismiss Duffy's retaliation claim (Count VII) for failure to

exhaust her administrative remedies.

2. *Hostile Workplace Claim*

The GAO also moves to dismiss Duffy's ADA hostile workplace claims (Counts II and

V), Dkt. 31 at 88–89, 91–92 (Second Am. Compl.), for failure to state a claim. Dkt. 33-1 at 26–

29. Although the D.C. Circuit has yet to decide the question, several other circuits and numerous

decisions from this Court have held that hostile workplace claims are cognizable under the ADA.

*See Lanman v. Johnson Cnty., Kansas*, 393 F.3d 1151, 1155–56 (10th Cir. 2004); *Shaver v.*

*Indep. Stave Co.*, 350 F.3d 716, 719–20 (8th Cir. 2003); *Flowers v. S. Reg'l Physician Servs.,*

*Inc.*, 247 F.3d 229, 232–35 (5th Cir. 2001); *Webster v. U.S. Dep't of Energy*, 267 F. Supp. 3d

246, 260 (D.D.C. 2017); *Ham v. Ayers*, No. 15-1390, 2019 WL 1202453, at *5 (D.D.C. Mar. 14,

2019); *Aldrich v. Burwell*, 197 F. Supp. 3d 124, 135 (D.D.C. 2016). Because the GAO does not

---

[3] The Court also notes that Duffy was represented by counsel at the time she filed her administrative complaint and that, as a result, her failure to include a claim for retaliation was not merely a mistake of nomenclature by someone untrained in the law. Dkt. 33-8 at 5–13.

dispute this premise, the Court will proceed on the assumption that the ADA authorizes recovery for hostile workplace claims.

To state a hostile workplace claim, an ADA plaintiff must allege that "(1) she is disabled or is perceived as disabled; (2) she was subjected to unwelcome harassment; (3) the harassment occurred because of her disability or the perception that she was disabled; (4) the harassment affected a term, condition, or privilege of employment; and (5) there is a basis for holding the employer liable for the creation of the hostile work environment." *Floyd v. Lee*, 968 F. Supp. 2d 308, 328 (D.D.C. 2013). In evaluating this type of claim, the Court "looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Id.* (quoting *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 577 (D.C. Cir. 2013) (per curiam)).

The GAO contends that the only factual allegations that even arguably support Duffy's hostile workplace claim are those involving the comments that Marks and Briscoe purportedly made during the October 2015 meeting. Dkt. 33-1 at 28. As Duffy describes those remarks, they were at times mocking and snide, suggested that Duffy was lying about her disability, and, more significantly, conveyed a threat that Duffy would risk revealing her "mental disorder" to the Comptroller of the United States and other senior officials if she insisted on pursuing her request for an accommodation. Dkt. 31 at 65–68 (Second Am. Compl. ¶ 190). Even assuming that Marks and Briscoe made these comments, the GAO maintains, Duffy's claim fails because a single conversation "fails to show the requisite 'cumulative effect' necessary to state a claim for a hostile work environment." Dkt. 33-1 at 28 (quoting *Baird v. Gotbaum*, 792 F.3d 166, 168 (D.C. Cir. 2015)).

According to Duffy, this allegedly caustic conversation forms only a part of her harassment claim.  Rather, in her view, her hostile workplace claim (Count II) Dkt. 31 at 88–89 (Second Am. Compl.), is predicated on a broader array of events.  She argues:

> [T]he totality of circumstances show that GAO Management hired [her] for an ad-hoc Communications "analyst-in-name-only" position in which she was subjected to pervasive ridicule, insult, and intimidation that was frequent, offensive, interfered with [her] work performance, altered the conditions of her employment, was connected to her membership in a protected class, and ultimately, damaged her health, interfered with her career, and resulted in her resignation.

> \*     \*     \*

> [She was] [s]ubjected to chaotic, dysfunctional working conditions where her work product could be rejected or appropriated at the convenience of others; routinely denied development and promotion opportunities commensurate with her professional attainments while being encouraged not to quit her job; passively denied the opportunity to engage in assignments more appropriate to her abilities due to an imbalance of entry level work which could have been equitably and easily reassigned; denied the tools to adequately perform her duties at the standard her training and expertise warranted, and—once she was known to have useful skills—subjected to extreme overwork that, in spite of her best efforts to manage it, eventually contributed to a serious breakdown of her physical health.

Dkt. 37 at 30.  Duffy further alleges that, during the Alternative Dispute Resolution ("ADR") process that was initiated after she filed her O&I complaint, "Marks . . . expressed contempt toward [Duffy], and continued to make . . . false statements about her [Reasonable Accommodation] request and her disability."  Dkt. 31 at 74 (Second Am. Compl. ¶ 216).  Even after the ADR process, Duffy contends that Marks continued to harass her, *id.* at 75 (Second Am. Compl. ¶ 218), and that "she had no choice but to submit to further harassment by Marks if she wished to be accommodated for her disability," *id.* (Second Am. Compl. ¶ 221).  In sum, her claims turn on the October 2015 meeting *and* on a pattern of contemptuous treatment and

failures to grant her reasonable accommodations, which ultimately led to her constructive discharge.

Duffy's allegations that she was subjected to "ridicule, insult, and intimidation that was frequent, offensive, interfered with [her] work performance, *id.* at 91 (Second Am. Compl.)," and that Marks "expressed contempt toward" her during the ADR process and continued to "harass" her after it concluded, *id.* at 74–75 (Second Am. Compl. ¶¶ 216–18), are conclusory and unsupported by the type of concrete factual allegations necessary to state a claim under Federal Rules of Civil Procedure 8 and 12(b)(6). *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009); *Schmidt v. U.S. Capitol Police Bd.*, 826 F. Supp. 2d 59, 71 (D.D.C. 2011) ("Plaintiff's statement that she was 'mistreated, harassed, intimidated[,] and disrespected' by her supervisor and co-workers . . . is nothing more than a legal conclusion."); *Aldrich v. Burwell*, 197 F. Supp. 3d 124, 137–38 (D.D.C. 2016) (finding allegations of "'rude, hostile, and otherwise demeaning treatment' . . . too vague and conclusory to meaningfully contribute to" the plaintiff's hostile work environment claim). For purposes of determining whether the second amended complaint states a claim of workplace harassment, the Court must, instead, focus on Duffy's factual allegations of specific, offensive workplace conduct.

Putting Duffy's conclusory allegations aside, she fails to allege facts sufficient to state a hostile workplace claim. To state a claim based on a hostile workplace, the plaintiff must allege facts that, if accepted as true, would show that her employer subjected her to discriminatory harassment that was "sufficiently severe or pervasive to alter the conductions of the victim's employment and create an abusive working environment." *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (quoting *Harris v. Forklift Sys., Inc*., 510 U.S. 17, 21 (1993)). This is not a "mathematically precise test," *Harris*, 510 U.S. at 22, but, rather, requires courts to

consider factors such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance," *id.* at 23.  The standard is a "demanding" one, however, in order to avoid turning federal antidiscrimination statutes into codes of "general civility."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (second quote quoting *Oncale v. Sundowner Offshore Servs.*, Inc., 523 U.S. 75, 82 (1998)).

It follows that "isolated incidents (unless extremely serious) will not amount to" a hostile work environment, *id.*, and that "the more severe the harassment, the less pervasive it needs to be, and vice versa," *Jimenez v. McAleenan*, No. 17-cv-2731, 2019 WL 3935182, at *7 (D.D.C. Aug. 20, 2019) (quoting *Ayissi-Etoh*, 712 F.3d at 579)).  It is extremely rare that a single incident is sufficiently severe to rise to the level of a hostile work environment, *Stewart v. Evans*, 275 F.3d 1126, 1134 (D.C. Cir. 2002), although even a single, extraordinarily offensive or demeaning assertion might suffice, *see, e.g.*, *Ayissi-Etoh*, 712 F.3d at 580 (Kavanaugh, J., concurring) ("[B]eing called the n-word by a supervisor [on one occasion] . . . suffices by itself to establish a racially hostile work environment").

Duffy has failed to allege facts sufficient to meet this "demanding" test.  To be sure, Marks's disparaging comments were not words alone, without tangible consequence—they were accompanied by alleged denials of Duffy's requests for reasonable accommodation.  But Courts in this district "frown[] on plaintiffs who attempt to bootstrap their alleged discrete acts of retaliation" or other employment discrimination "into a broader hostile work environment claim."  *Thomas v. Securiguard Inc.*, No. 18-0125, 412 F. Supp. 3d 62, 91 (D.D.C. 2019) (quoting *Mason v. Geithner*, 811 F. Supp. 2d 128, 177 (D.D.C. 2011)).  To be sure, "[t]he *prolonged* denial of a reasonable accommodation can underlie a hostile work environment claim

when 'all the circumstances' would support such a claim." *Floyd v. Lee*, 85 F. Supp. 3d 482, 518 (D.D.C. 2015) (emphasis added) (quoting *Oncale*, 523 U.S. at 81). But, here, Duffy's own allegations show that the GAO allowed her to telework for extended periods of time, *see, e.g.*, Dkt. 31 at 54–55 (Second Am. Compl. ¶ 158), and the overall "circumstances" alleged in the second amended complaint do not meet the standard for either severity or pervasiveness necessary to state a claim based on a hostile workplace. Although the Court does not doubt that Duffy's interactions with Marks and Briscoe were both objectively and subjectively upsetting, the second amended complaint fails to identify the type of "severe or pervasive" hostility or abuse necessary to state this type of claim. *See Achagzai v. Broadcasting Bd. of Governors*, 170 F. Supp. 3d 164, 184 (D.D.C. 2016) (quoting *Harris*, 510 U.S. at 21).

Accordingly, the Court will dismiss Duffy's hostile workplace environment claim for failure to state a claim.

### 3. *The GAO's Motion for Summary Judgment*

Finally, GAO moves for summary judgment with respect to Duffy's ADA claims (Counts I–VII), Dkt. 31 at 87–95 (Second Am. Compl.), on the ground that she abandoned each of her requests for a reasonable accommodation. Dkt. 33-1 at 13, 23–26. When considering a motion for summary judgment, unlike a motion to dismiss, the Court may consult evidence outside the pleadings to determine whether a genuine issue of material fact exists. *See* Fed. R. Civ. P. 56(a), (c). Because the Court has already concluded that Duffy has exhausted her administrative remedies only with respect to her October 2015 and November 2015 requests for a reasonable accommodation, the Court considers the GAO's motion for summary judgment with respect to only those requests. Moreover, because Duffy brings just one claim for failure to accommodate (Count III) relying on both requests, Dkt. 31 at 89–90 (Second Am. Compl.), the GAO must

show that both requests were abandoned to obtain summary judgment on that claim. After reviewing the still-developing record, the Court concludes that the "issues need further development" and thus exercises its "discretion to deny [the] motion for summary judgment without prejudice." 10A Wright & Miller, Federal Practice and Procedure § 2718 (4th ed. 2019).

The GAO argues that Duffy abandoned her request for a reasonable accommodation because she refused to engage in the "interactive process" contemplated by the ADA. *See Ward v. McDonald*, 762 F.3d 24, 32 (D.C. Cir. 2014) (describing the "interactive process" as "'a flexible give-and-take' between employer and employee 'so that together they can determine what accommodation would enable the employee to continue working'" (quoting *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir. 2005))). With respect to Duffy's October 2015 request, the GAO contends that Duffy stopped participating in the interactive process when she requested that "all further action on [her] [Reasonable Accommodation] request be stopped, pending an EEO complaint." Dkt. 33-1 at 23–26; Dkt. 33-2 at 1 (Def.'s SUMF ¶ 4); Dkt. 33-5 at 2;

But, Duffy claims that it takes two to tango and the GAO was an unwilling dance partner. She alleges that, during the October 22, 2015 meeting, Marks verbally denied Duffy's October 2015 request; refused to provide her with "[a]gency guidance related to . . . standards for administering" reasonable accommodation requests; and made statements designed to intimidate and to discourage Duffy from seeking review of Marks's decision. Dkt. 31 at 65–69 (Second Am. Compl. ¶ 190). Duffy alleges, for example, that when she inquired about the basis for Marks's denial of her request, Marks said the request could go to the Accommodations Committee but then admonished Duffy: "let me tell you what is going to happen if I do that. The Comptroller of the United States—and several members of the Executive Committee—are going

to learn all about your 'mental disorder.'  Would you like me to do that?"  *Id.* at 66 (Second Am. Compl. ¶ 190).  Duffy further alleges that, at various points, Marks refused to explain why she was not crediting the medical evidence and other documentation that Duffy had provided in support of her request.  *See id.* at 65–68 (Second Am. Compl. ¶ 190).

The "interactive process" used to determine whether an accommodation is necessary and appropriate depends on the good faith participation of both the employer and employee; "neither party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability."  *Sears, Roebuck & Co.*, 417 F.3d at 805 (quoting *Beck. v. Univ. of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996)).  It follows that, if an employer participates in the "interactive process" in "bad faith," the employer may be deemed to have denied the accommodations request.  *Ward*, 762 F.3d at 32.  That bad faith may take the form of "obstruct[ion] or delays [in] the interactive process" or "fail[ure]s to communicate" with the other party, because such actions are the "cause of the breakdown" in the process.  *Id.* (quoting *Sears, Roebuck & Co.*, 417 F.3d at 805).  By that same logic, bad faith may also take the form of threats or other actions taken solely for the purpose of discouraging an employee from pursuing a request for an accommodation.

The GAO may be right that Duffy is to blame for the breakdown in the interactive process; the record contains evidence that she expressly abandoned her request for an accommodation.  *See, e.g.*, Dkt. 33-5 at 2 ("At this time . . . I have asked that all further action on my RA request be stopped, pending an EEO complaint").  But it is also possible that Marks erected insuperable hurdles to the process or otherwise obstructed Duffy's efforts to seek an accommodation.  As Duffy explained in a memorandum to Marks, she "believe[d] that the communication dynamics within the GAO's [Reasonable Accommodation] office [were]

sufficiently dysfunctional as to make GAO's [Reasonable Accommodation] process administratively ineffective and medically unsafe for [her] to participate in." *Id.* Duffy further posited that she had already submitted documentation sufficient to support her request and that Marks and Briscoe responded in a manner that left her convinced that the process was "hopelessly tainted with bias and discrimination against [her] based on the nature of [her] disability." *Id.* at 8.

On the present record, the Court cannot decide who is right—and certainly cannot do so with the certainty required to resolve a claim on summary judgment before potentially relevant discovery is complete. The Court will, accordingly, deny the GAO's motion for summary judgment without prejudice and will allow the parties to take additional discovery regarding the "interactive process."

## F.    Rehabilitation Act

The Court turns finally to the GAO's challenge to Duffy's sole claim for relief under the Rehabilitation Act (Count VIII), which alleges that Duffy was denied a reasonable accommodation and was constructively discharged as a result of the GAO's unlawful disability discrimination. Dkt. 31 at 95–96. The GAO contends that this claim should be dismissed because the Rehabilitation Act does not apply to the GAO, Dkt. 33-1 at 14, or, in the alternative, because Duffy failed to exhaust her administrative remedies, *id.* at 20–23. Because the Court agrees with the first of these contentions, it does not reach the second.

The Court begins its interpretation of the Rehabilitation Act with the text of the statue. *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999). The Rehabilitation Act provides, in relevant part, that otherwise qualified individuals with disabilities, may not "be excluded from the participation in, be denied the benefits of, or be subjected to discrimination

under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service." 29 U.S.C. § 794(a). The GAO is not an "Executive agency," *see Chennareddy v. Bowsher*, 935 F.2d 315, 319 (D.C. Cir. 1991); *see also* 31 U.S.C. § 702(a) (the GOA is an "instrumentality of the United States Government independent of the executive departments"), nor is it a "program or activity conducted by an Executive agency" or a "program or activity receiving Federal financial assistance," 29 U.S.C. § 794(a). Although the GAO, like all government offices, operates pursuant to a congressional appropriation of funds, that does not mean that it is a "program or activity receiving Federal financial assistance" or else there would be little reason to specify separately that "programs or activities conducted by" the Executive branch are covered by the Rehabilitation Act. *See Corley v. United States*, 556 U.S. 303, 314 (2009) (rejecting an interpretation that was "at odds with one of the most basic interpretive canons, that '[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant'" (quoting *Hibbs v. Winn,* 542 U.S. 88, 101 (2004) (alternation in original)). The text of the Rehabilitation Act itself, therefore, does not reach the GAO.

To be sure, Congress did extend the Rehabilitation Act to apply "to the legislative branch of the Federal Government" when it enacted the Congressional Accountability Act ("CAA"). *See* 2 U.S.C. §1302(a). But, in so doing, Congress provided the protections of the Rehabilitation Act and other statutes only to "covered employee[s]," which the CAA defines as "any employee of" eleven different enumerated government entities. 2 U.S.C. § 1301(a)(3). The GAO does not appear on that list. *Id.* The Court recognizes that other provisions of the U.S. Code treat the GAO as an "instrumentality of Congress." 42 U.S.C. § 12209(4); *see also Chennareddy*, 935

F.3d at 319 ("GAO is a legislative branch agency . . . ."). Had Congress incorporated that definition in the CAA, or had it merely directed that the CAA would apply to the "legislative branch" of the government, the GAO's status as a legislative branch agency might have been enough to extend the Rehabilitation Act to the GAO. *See Ethyl Corp. v. EPA*, 51 F.3d 1053, 1061 (D.C. Cir. 1995) ("[M]ention of one thing implies the exclusion of another" (quoting *Am. Methyl Corp. v. EPA*, 749 F.2d 826, 835–36 (D.C. Cir. 1984)).

Finally, the Court notes that the statute creating the GAO provides that "all laws generally related to administering an agency apply to the Comptroller General." 31 U.S.C. § 704(a). Similarly, the GAO's personnel statute provides that its provisions "do not affect a right or remedy of an officer, employee, or applicant for employment under a law prohibiting discrimination in employment in the Government on the basis of . . . [a] handicapping condition." 31 U.S.C. § 732(f)(2). Those general provisions, however, cannot override Congress's exclusion of the GAO from its extension of the Rehabilitation Act to specific instrumentalities of Congress. "Where there is no *clear* intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment." *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 445 (1987) (quoting *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 (1976)). Nothing in the laws that, in general, govern the administration of the GAO conveys a "clear intention" to override either the Rehabilitation Act or the CAA.

The Court will, according, dismiss Duffy's Rehabilitation Act claim pursuant to Rule 12(b)(6).

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss for lack of subject-matter jurisdiction and failure to state a claim, and in the alternative, motion for summary judgment, Dkt. 33, is hereby **GRANTED** in part and **DENIED** in part.

**SO ORDERED**.


/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge


Date:  March 21, 2020